## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT M.B.

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEY FOR APPELLANT J.W.

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of M.B., Mother, and J.W., Father, and W.B., Child,

M.B. and J.W.,

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

January 12, 2016

Court of Appeals Case No. 35A02-1505-JT-360

Appeal from the Huntington Circuit Court

The Honorable Thomas M. Hakes, Judge

Trial Court Cause No. 35C01-1312-JT-9

**Kirsch, Judge.**

[1] M.B. ("Mother") and J.W. ("Father") (together, "Parents") appeal the juvenile court's order terminating their parental rights to their child, W.B. Parents raise the following restated issue on appeal: whether sufficient evidence was presented to support the termination of Parents' parental rights.

[2] We affirm.

## Facts and Procedural History

[3] Mother and Father are the biological parents of W.B., who was born September 19, 2012.[1] At birth, W.B. had methadone in his system due to Mother's use during pregnancy. At that time, Father was incarcerated,[2] and he remained incarcerated through and after the termination hearing. The facts most favorable to the judgment reveal that, on October 12, 2012, Mother and her male companion brought W.B. to Parkview Huntington Hospital ("Hospital") out of concern for his size and weight. W.B. was admitted to the Hospital for failure to thrive due to dehydration and weight loss. While at the Hospital, personnel observed that Mother and her companion seemed impaired. Family Case Manager Colleen Crawley ("FCM Crawley") arrived at the Hospital and spoke with Hospital employees, who told her that W.B. was born methadone positive. FCM Crawley observed that Mother was slurring her words, swaying,

---

[1] Father's paternity was established later, in May 2014.

[2] Father was incarcerated in August 2012 on a Class C felony escape conviction. *Father's Br*. at 6.

unable to keep eye contact, and could not spell her children's names.[3] Mother took and failed a drug test. On October 16, 2012, the Indiana Department of Child Services ("DCS") filed a Child in Need of Services ("CHINS") petition on the basis of W.B.'s failure to thrive and Hospital admission, Mother's intoxication, and Father's inability to care for W.B. given his incarceration. W.B. was removed and placed in foster care.[4] At the November 15, 2012 fact-finding hearing, the juvenile court found that Mother tested positive for methadone and hydrocodone and that the children's physical or mental condition was endangered as a result of Mother's use of drugs while caring for her children; it then adjudicated W.B. to be a CHINS.

[4] At the December 11, 2012 dispositional hearing, the juvenile court ordered Parents to participate in services, including: (1) Mother was to undergo an evaluation at the Otis T. Bowen Center in Huntington ("the Bowen Center") and complete twenty weeks of Chemical Dependency group classes; (2) Father, upon release from incarceration, was to be assessed for services at the Bowen Center and progressively establish a relationship with W.B.; (3) Mother was required to submit to random drug screens; (4) Mother was to abstain from use of illegal drugs, only consume drugs as prescribed to her, and complete parenting classes through Youth Service Bureau and/or home-based counseling

---

[3] The record indicates that Mother is also the biological mother of J.B., P.N., and D.N. Father is not the biological father of those children.

[4] W.B.'s three half-siblings were also removed from Mother's care.

through the Bowen Center; (5) Mother was to maintain contact with the family case manager; and (6) Mother was to actively seek employment to provide for her children.

[5] At the six-month periodic case review hearing, in May 2013, Mother appeared in person, and Father was still incarcerated and did not appear. The juvenile court found, among other things, that Parents "have not complied with [W.B.'s] case plan" and "have not regularly visited with [him]." *DCS Ex.* 18. Mother's visitations were suspended "until she gets a clean drug screen." *Id*. The projected date for reunification was October 12, 2013. At the next periodic case review hearing, in August 2013, the juvenile court found that Parents had not complied with the case plan, had not regularly visited W.B., and had not cooperated with DCS. It noted that Mother was entitled to supervised visits with W.B. "once [M]other succeeds in having three consecutive clean drug screens." *DCS Ex.* 19. The permanency plan remained to have W.B. return home by October 12, 2013.

[6] At a September 2013 review hearing, the juvenile court found that W.B. had been residing in foster care for approximately one year and was doing well. It found that Mother was not in compliance as follows: Mother continued to test positive in drug screens; she failed to appear for drug screens; her supervised visits were suspended due to her testing positive for methadone and would continue to be suspended until she tested clean on three consecutive occasions; she only sporadically attended Chemical Dependency group sessions, and when she did regularly attend, she showed "no transfer of learning" as she continued

to test positive for drugs. *DCS Ex.* 20. Father remained incarcerated with his earliest possible release date being August 27, 2015. The juvenile court found that Father "has not contacted DCS with information of participating in any services." *Id.* The juvenile court found the most appropriate permanency plan was termination of parental rights, and on December 9, 2013, DCS filed a petition to terminate the parental rights of Parents. *Father's App.* at 23-26. DCS alleged that at least one of the following was true: (1) there was a reasonable probability that the conditions that resulted in W.B.'s removal or the reasons for placement outside the home of Parents will not be remedied; (2) there was a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of W.B. It also alleged that termination was in W.B.'s best interest and that there was a satisfactory plan for the care and treatment of W.B., namely termination of parental rights and adoption. *Id.* at 24.

[7] Several day later, on December 12, 2013, Mother was criminally charged with welfare fraud and perjury, concerning her receipt of social security income benefits for a son that was at that time in foster care. *DCS Ex.* 22. In September 2014, she pleaded guilty to Class C felony welfare fraud and Class D felony perjury. For the welfare fraud conviction, the trial court sentenced her to two years, plus two years for aggravating circumstances, with two years suspended to probation. For the perjury conviction, the trial court imposed a sentence of one and one-half years, all suspended to probation and to be served concurrently with the welfare fraud sentence. She was released from

incarceration to a work release program in fall 2014 and released entirely in January 2015.

[8] Shortly thereafter, the juvenile court held the termination hearing, on January 23, 2015, at which the following testimony and evidence was presented.[5] DCS first presented the testimony of Marla McQuinn ("McQuinn"), a substance abuse therapist at the Bowen Center. She stated that Mother was evaluated in October 2012, as recommended by DCS, and began a substance abuse group counseling program in November 2012, which she attended for a year, before her incarceration. McQuinn stated that although Mother, for the most part, attended consistently for a year, she sometimes came to meetings appearing intoxicated, and she admitted relapses. McQuinn referred Mother to a couple of inpatient residential treatment programs, which McQuinn explained "absolutely" would need to be followed by sixteen weeks of intensive outpatient therapy. *Tr.* at 53. Mother did not follow through in obtaining inpatient treatment. McQuinn opined that Mother did not achieve "transfer of learning" in the group sessions and never successfully completed substance abuse treatment. *Id.* at 51-52. McQuinn recognized that at the time of the termination hearing, Mother had been "clean for thirteen months," but McQuinn opined that because that period was during incarceration, and thus a "controlled environment," it did not provide a good assessment of Mother's

---

[5] W.B.'s termination hearing was consolidated with the termination proceedings relative to his three half-siblings, J.B., P.N., and D.N., although we limit our discussion to that which is relevant to W.B.

ability to voluntarily stay sober. *Id*. at 53. Days after her release from incarceration, Mother resumed services with the Bowen Center, and she attended three group sessions prior to the termination hearing, appearing sober and participating at those sessions.

[9] Diane Nei ("Nei"), a provider of home-based services for the Bowen Center, also testified. She began seeing Mother in December 2012 with the goal of providing parenting services, such instruction regarding budgeting, employment, and obtaining a G.E.D., and Nei also supervised some of Mother's visitations. Nei testified that Mother missed some appointments, "either canceled, or . . . no shows or I wasn't able to find her," meaning no one came to the door upon Nei's arrival. *Id*. at 61. As for visitations, Nei described Mother as "warm and concerned" with the children. *Id*. at 67-68. As far as employment, Nei stated that Mother had a job at a factory for a few weeks but quit, and Mother did not obtain her G.E.D. Kellie Woll ("Woll"), also of the Bowen Center, provided individual counseling to Mother for coping and calming skills and for depression. She testified that those goals were not achieved, as Mother "was not being consistent" in therapy, and did not take the learned skills and apply them outside of the therapy session. *Id*. at 73. Mother also shared with Woll her difficulty in remaining sober "and not doing any type of drug." *Id*. at 74. When asked if Mother successfully completed her individual therapy, Woll replied, "I would have to say no." *Id*. at 74.

[10]     FCM Crawley testified regarding provision of services and attempts to reunify W.B. with Parents.[6]  FCM Crawley testified that W.B. was first removed from Mother's home on October 13, 2012, and that he was never returned to Mother's care.  Mother was initially in compliance with recommended services, as she attended services at the Bowen Center, regularly met with FCM Crawley, and took drug screens.  But by the end of January 2013, Mother started testing positive for drugs, and visitation returned to being supervised.  After she tested positive for methadone during a visitation in March or April 2013, DCS suspended her visitations and informed Mother that to resume visits with W.B. she needed three consecutive clean drug screens, which never occurred.  FCM Crawley testified that DCS attempted other services at the Bowen Center to assist Mother with maintaining sobriety, but Mother was not consistent, having multiple cancellations and no shows.  Although Mother attended group sessions, "[T]here was not transfer of learning."  *Tr.* at 96.  Mother's communication with FCM Crawley lessened as she "got more heavily involved with the drugs."  *Id.* at 97.  In total, Mother tested positive for drugs sixty-three times during the course of the proceedings.  *Id.* at 156.  With regard to employment and housing, FCM Crawley testified that Mother had one job for a few weeks and that was the only employment during the pendency of the case.  FCM Crawley stated that Mother's housing was not stable, moving from the original house from which W.B. was removed, to an apartment, where

---

[6] FCM Crawley also testified about DCS services provided to the other children, but we limit our discussion to W.B.

during one of FCM Crawley's visits there was no power as it had been turned off, to living with her aunt and then her parents, to incarceration.

[11] FCM Crawley stated that she may have received one letter from Mother during her incarceration, which was approximately December 2013 to January 2015. Mother's original release date was December 2014, but it was extended until January 8, 2015 for conduct violations. FCM Crawley heard from Mother via text communications a couple of times during her five-month work release period, and FCM Crawley met with Mother on one occasion after her January 8, 2015 release and before the January 23 termination hearing. Mother also took and passed a drug screen in that period between her release and the termination hearing, and Mother asked FCM Crawley for additional screens.

[12] FCM Crawley's biggest concern about Mother was her ability to maintain sobriety. FCM Crawley testified that during the pendency of the action Mother tested positive for a wide range of substances including, methamphetamines, methadone, Xanax, morphine, hydrocodone, and marijuana. "So basically it appeared that any substance that she could obtain would be used." *Tr*. at 108. On one occasion after a drug screen, the lab contacted FCM Crawley with concerns about the morphine level to "mak[e] sure that I was having contact with her to find out even if she was alive [] cause her levels were so high." *Id*. at 108. FCM Crawley explained her serious concerns about Mother's ability to stay sober and maintain a safe and stable environment, particularly since she had not completed an intensive drug abuse program. Mother's lack of

employment was also a concern because "employment and financing [] go hand in hand in helping [] to have a stable home life." *Id*. at 109.

[13] Mother acknowledged her drug usage and her addiction. She stated that the counseling helped, but "just wasn't enough" and that she "needed . . . . rehab." *Id*. at 161-62. She testified that she repeatedly attempted to get off the drugs, but she would "go right back to it." *Id*. She stated that being incarcerated gave her the chance to get sober. Mother maintained that she "would never take another substance" and "would never go back to that again." *Id*. at 171. As far as having a relationship with W.B., she acknowledged that she had not seen him in approximately two years.

[14] Turning to Father's situation, at the time of W.B.'s birth, Father was incarcerated for Class C felony escape, stemming from an incident when he attempted to run from a court hearing, and his projected date of release was September 11, 2015. Father acknowledged that he originally had an earlier release date but it was extended due to conduct violations and that he was deemed a habitual rule violator.

[15] Father testified that he attempted to contact DCS on multiple occasions while he was incarcerated and that he sought visitation with W.B. FCM Crawley acknowledged at the hearing that DCS received "ten to twenty" letters from Father and that he asked "what services he could do or what he could do to be a better parent." *Id*. at 126. FCM Crawley testified that she told Father that he needed to maintain good behavior in the prison system and upon release he

should begin services and visitation through the Bowen Center. With regard to services offered or completed, Father testified that he voluntarily took a Department of Correction ("DOC") course called Inside/Out Dad Program. *Id*. at 197. He testified that he earned/completed an auto collision repair specialist certification and that he would have employment upon his release. *Id*. at 201. DCS presented records reflecting that while he was in DOC, Father was enrolled in a therapeutic drug rehabilitation program, but was removed from the program because Father "was not serious about sobriety" and was "disruptive" and broke rules. *DCS Ex*. 40.

[16] With regard to visitation, clinical psychologist Lynn Baker ("Baker"), who was employed at the Bowen Center, testified that pursuant to Father's request to have visitation with W.B., DCS asked her to assess whether it would be in W.B.'s best interest to have visitation with Father at DOC. She concluded that it would not be in W.B.'s best interest based on a number of factors, including: he was two years old; he did not know Father, having never met him; he was afraid of strangers; and "It would have been extremely terrifying for him to have that introduction occur in a prison setting." *Id*. at 136. She elaborated that the prison setting is traumatic even for older school-aged children, given the "loud noise, the stark setting . . . it is very foreign to a child and very difficult to effectively manage." *Id*. at 146. Father disagreed, stating that DOC had a specific "kid's safe zone" designed for visitations, which was quiet and monitored. *Id*. at 201. FCM Crawley testified that visitation with Father had

not occurred because of the results of Baker's evaluation and the subsequent court order. *Id.* at 103-04.

[17] Prior to his most recent incarceration, Father had been in and out of prison a number of times. His criminal history extended back to at least 1996, and he had at least ten convictions between 1996 and 2009.[7] Father testified that his latest period in DOC served "as a wakeup call." *Id.* at 203. Father acknowledged that he made mistakes but maintained, "I'm a good parent, I'm a good dad" and that "all[] I'm asking for is to give me a chance to show that[.]" *Id.* FCM Crawley expressed "serious concerns" about Father's ability to parent W.B. given his criminal history and his admitted substance abuse issues. *Id.* at 110.

[18] FCM Crawley testified that she did not believe that the problems that led to W.B.'s removal were likely to be remedied. *Id.* She also stated that Mother, given her substance use, posed a threat to W.B.'s well-being, and that Father likewise posed a threat to W.B.'s well-being, given Father's criminal history, past drug use, and "lack of being able to be involved in [W.B.'s] life" at all. *Id.* at 111-12. She testified that, while "we would have loved to be able to reunify . . . there was never a time that there was a safe and stable environment to do so," and thus it was her belief that it was in W.B.'s best interest that Parents'

---

[7] At the beginning of the termination hearing, Father objected to DCS's plan to introduce his criminal records, arguing those convictions occurred prior to W.B.'s birth and were irrelevant to Father's ability to parent W.B. at the present time. The juvenile court deferred ruling at that time, but ultimately admitted them into evidence.

parental rights be terminated. *Id*. at 112. Baker likewise testified to her opinion that, based on the circumstances and factors of this case, including that Parents were "absent or chronically substance abusing parents," such that W.B. was placed in foster care at three weeks of age and had never met Father, she believed termination of parental rights was in W.B.'s best interest. *Id*. at 142-43.

[19] With regard to W.B.'s current situation and permanency plan, FCM Crawley explained that there had been a fairly recent placement change, in November 2014, when W.B. was transferred from his first foster home due to a report of safety concerns, and he was placed in another foster home with one of his older half-siblings. Although the safety report on the first home was later determined to be unsubstantiated, W.B. remained in the second foster home because he was "doing very well" there and because those foster parents expressed interest for long term care and eventual adoption, if that became an available option. *Tr*. at 105; *see also id*. at 112, 244 (plan is adoption if court terminates parental rights). She stated that the current foster parents "have an ongoing relationship with the older two children . . .and it would be a placement that would be able and willing to meet and exceed the needs of the children long term[.]" *Id*. at 105. With regard to the possibility of placing W.B. with the maternal grandparents ("Grandparents"), who had an ongoing relationship with all the four children, FCM Crawley testified that Grandparents did voluntarily complete a parenting class at the Youth Services Bureau, but that the reports from that were that Grandparents were good at handling the children for short

periods, but full time care for the four children would be more than they could handle. FCM Crawley further testified that she had concerns about Grandparents' ongoing failure to recognize the severity of Mother's drug usage, noting that, until Mother was incarcerated, "the [Grandparents] did not believe that [Mother] had any kind of a substance abuse problem at all." *Id.* at 124.

[20] On April 15, 2015, the juvenile court issued its findings of fact, conclusions, and order terminating Parents' parental rights to W.B. Parents separately appeal.[8]

# Discussion and Decision

[21] As our Supreme Court has recently reiterated, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]" *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will

---

[8] The record indicates that W.B.'s half-siblings were also adjudicated CHINS. *DCS Exs.* 5, 8. According to DCS, those siblings "were also the subject of consolidated termination proceedings, but Mother only appeals [W.B.'s] termination." *DCS Br.* at 1, n.1.

set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. at 148-49.

[22] Here, in terminating Parents' parental rights to W.B., the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id*. If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[23] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *Id*. at 1155. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re H.L.*, 915 N.E.2d at 149. In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013).

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B)  that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)  that termination is in the best interests of the child; and
>
> (D)  that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).  The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'"  *In re H.L.*, 915 N.E.2d at 149.  Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a) (emphasis added).

Parents argue that DCS failed to prove the required elements for termination by sufficient evidence.  Specifically, they contend that DCS failed to present sufficient evidence that the conditions that resulted in W.B. being removed

would not be remedied. Father also argues that DCS failed to present sufficient evidence that the continuation of the parent-child relationship posed a threat to W.B. Both parents allege that DCS failed to present sufficient evidence that termination of their parental rights was in the best interests of W.B. and that there was a satisfactory plan in place for W.B.

### Remediation of Conditions

[26] Mother asserts that the reasons for W.B.'s removal, namely her substance abuse, were remedied, and Father asserts that he was incarcerated before W.B. was born, was not present when W.B. was removed from Mother's care, and thus "had nothing to do with the circumstances of the child's removal." *Father's Br*. at 6. In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to their placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id*. (quotations omitted). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against " 'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.,* 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of

a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cnty. Office of Family & Children,* 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied.* In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.,* 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d at 643. Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior. *Id.*

[27] Here, the evidence showed that W.B. was born in September 2012, with methadone in his system. Several weeks later, Mother brought W.B. to the Hospital, where he was admitted for failure to thrive and dehydration. Hospital personnel observed that Mother appeared impaired, and she tested positive for methadone and hydrocodone in her system. W.B. was removed from Mother's care; at that time, Father was unable to care for W.B. due to his incarceration. W.B. was later adjudicated as a CHINS. W.B. continued to be placed outside of the home because Mother failed to benefit from the services offered by DCS, she continued using illegal drugs, and she was unable to maintain stable housing and employment. Although she had a short period of unsupervised visits, they were suspended in April 2013 when she was found to be under the

influence of drugs during a visitation. She was not able to resume visitations with W.B. because she never had three consecutive clean drug screens. In December 2013, she was arrested and incarcerated for approximately one year for welfare fraud. At the time of the January 2015 termination hearing, Mother had been released from incarceration and work release for approximately two weeks. Mother had not seen or had contact with W.B. since April 2013. Mother never completed a residential treatment program, although at the termination hearing she acknowledged that she could not quit the drugs and needed rehabilitation. We further observe that, contrary to Mother's suggestion that W.B. was removed solely due to her drug usage, W.B. was not returned to her also because of other issues, including her lack of both employment and stable housing. Mother had been employed only for a few weeks during the course of the case, and at the time of the hearing, she was looking for, but had not yet obtained, employment.

[28] As for Father, the evidence showed that Father had been in and out of incarceration since 1996. He was incarcerated in October 2012, when W.B. was admitted to the Hospital and thereafter removed from Mother's care. W.B.'s continued placement outside of Father's care was due to Father's continuing incarceration, which rendered Father incapable of providing W.B. with food, clothing, shelter, and other basic life necessities. At the time of the January 2015 termination hearing, these conditions had still not been remedied. Specifically, Father remained incarcerated with an earliest possible release date of September 2015. Father had an extended and continuous criminal history

and history of prior substance abuse. We have previously recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 374 (Ind. Ct. App. 2006) (concluding that trial court did not commit clear error in finding conditions leading to child's removal from father would not be remedied where father, who had been incarcerated throughout CHINS and termination proceedings, was not expected to be released until after termination hearing), *trans. denied.*

[29] Mother and Father both asserted at the termination hearing that they were ready to stay clean and sober and provide a stable life for W.B.; however, FCM Crawley testified that, in her respective opinion, there was not a reasonable probability that the problems that led to removal would be remedied. Based on the evidence presented, we conclude that the juvenile court did not err in finding that there was a reasonable probability that the conditions that resulted in the removal and the reasons for continued placement of W.B. outside the home would not be remedied.

### Threat to Well-Being

[30] Father also contends that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of W.B. However, we need not address such argument. Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court

need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S.*, 987 N.E.2d at 1156. Therefore, as we have already determined that sufficient evidence supported the conclusion that the conditions that resulted in the removal of W.B. would not be remedied, we will not address any argument as to whether sufficient evidence supported the conclusion that the continuation of the parent-child relationship posed a threat to the well-being of W.B.

### *Best Interests*

[31] Parents next argue that insufficient evidence was presented to prove that termination is in the best interest of W.B. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). The trial court need not wait until the child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that

termination is in the child's best interests. *Id.* (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

[32] Here, the evidence showed that Mother and Father both had a history of substance abuse. Mother attempted some services, but never successfully completed services aimed at helping her maintain sobriety. During the course of the proceedings, she tested positive sixty-three three times for the following drugs, either individually or in combinations: codeine; hydrocodone; methadone; THC; Xanax; amphetamine; methamphetamine; oxycodone; and morphine. She conceded that, although she attempted to quit drugs, she would return to them, and that she needed rehabilitative treatment. Mother argues that she had been sober for about a year at the time of the termination proceeding; however, her period of sobriety was while she was incarcerated and the two weeks that followed. Substance abuse therapist McQuinn testified that incarceration was a controlled environment and not a good gauge of Mother's ability to voluntarily stay sober. Moreover, Mother did not maintain stable housing and had very little employment. She also did not obtain her G.E.D. as ordered.

[33] Father was incarcerated during W.B.'s entire life. Father's current incarceration for Class C felony escape occurred because, during a hearing on criminal non-support of another dependent, Father became upset and tried to leave the courthouse. Father admitted to having had substance abuse issues prior to incarceration, and there is no evidence that he received or successfully completed any treatment for that. In fact, the record reflects that while Father

was in DOC, he was enrolled in a therapeutic drug rehabilitation program, but was removed from the program because he "was not serious about sobriety" and was "disruptive" and broke rules. *DCS Ex*. 40. Mother was incarcerated for a year during the proceedings, and Father was incarcerated the entirety of W.B.'s life. He has at least ten convictions between 1996 and 2009, plus multiple probation violations. Father had no bond with W.B., having never met him. W.B. had been in foster care since his removal in October 2012, living first with one family through November 2014, and then with a second family that expressed interest in long term care and adoption, if that option became available. The Bowen Center's clinical psychologist Baker and FCM Crawley both testified that they believed that termination of the Parents' parental rights was in W.B.'s best interest. Accordingly, we conclude that sufficient evidence was presented to prove that termination was in the best interest of W.B.

### Satisfactory Plan

[34] Parents also assert that DCS failed to establish that there is a satisfactory plan for the care and treatment of W.B. For a plan to be "satisfactory," for purposes of the statute, it "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re D.D.,* 804 N.E.2d at 268. Here, the juvenile court concluded that a satisfactory plan existed for W.B., "that being adoption." *Mother's App*. at 191.

[35]     On appeal, Mother claims that DCS failed to prove that the current foster placement "or anyone else for that matter" intended to adopt W.B., and Father states that any plan for W.B. "was, at best, 'general.'" *Mother's Br.* at 4; *Father's Br.* at 14. Our review of the record reflects otherwise. FCM Crawley stated that the current foster family had an ongoing relationship with W.B.'s older half-siblings, at least one of whom was placed with W.B., and that the family expressed interest in long term care of W.B. and eventual adoption of him. *Tr.* at 104-05. To the extent that Parents' argument is that DCS's plan needed to be more specific, we reject that claim. We have held,

> A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the children. In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. Accordingly, a plan is not unsatisfactory if DCS has not identified a specific family to adopt the children.

*In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied* (internal citations omitted).

[36]     We will reverse a termination of parental rights "only upon a showing of 'clear error'-- that which leaves us with a definite and firm conviction that a mistake has been made." *McBride*, 798 N.E.2d at 199 (citing *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997)). Based on the record before us, we cannot say that the juvenile court's termination of Parents' parental rights to W.B. was clearly erroneous. We therefore affirm the juvenile court's judgment. Affirmed. MATHIAS, J., and BROWN, J., concur.